**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| RIVIERA PLAZA INVESTMENTS, LLC, | Case No. 12-18109 |
| Debtor. | The Honorable Eugene R. Wedoff |

## NOTICE OF MOTION

     Please take notice that on August 15, 2012 at 9:30 a.m. CT or as soon thereafter as counsel may be heard, I shall appear before the Honorable Eugene R. Wedoff or any Judge sitting in his stead in Courtroom 744 in the United States Bankruptcy Court, 219 South Dearborn Street, Chicago, IL and then and there present the *Debtor's Motion to Vacate Order Lifting Automatic Stay* (the "**Motion**"), a copy of which is hereby served upon you.

Dated: August 10, 2012

Respectfully submitted,

RIVIERA PLAZA INVESTMENTS, LLC

By: /s/ Ethan Ostrow

Ethan Ostrow (ARDC No. 6290394)
BROWN, UDELL, POMERANTZ &
DELRAHIM, LTD.
1332 North Halsted Street, Suite 100
Chicago, IL 60642
Telephone: (312) 475-9900
Facsimile: (312) 475-1188
Email: eostrow@bupdlaw.com

*Counsel to the Debtor and Debtor in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| RIVIERA PLAZA INVESTMENTS, LLC | Case No. 12-18109 |
| Debtor. | The Honorable Eugene R. Wedoff |

## DEBTOR'S MOTION TO VACATE ORDER LIFTING AUTOMATIC STAY

The above-captioned debtor and debtor in possession (the "**Debtor**"), by and through its undersigned counsel, hereby submits this motion (the "**Motion**") for entry of an Order, pursuant to Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), vacating this Court's July 24, 2012 Order lifting the automatic stay in this case effective as of August 15, 2012 (the "**Lift Stay Order**").  In support of this Motion, the Debtor respectfully states as follows:

### JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (G).

2.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory basis for the relief requested herein is section 362 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**") and Rule 9024 of the Bankruptcy Rules.

### BACKGROUND

4.     On May 2, 2012 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.     The Debtor remains in possession of its assets and continues to operate its

business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6. No trustee, examiner, or committee has been appointed in the Case.

7. The Debtor owns and manages a certain parcel of real estate and the improvements thereon located in Fort Wayne, Indiana, at an address commonly known as 3201-61 St. Joe Center Road, Fort Wayne, Indiana 46835 (the "**Real Property**"). The Real Property is operated as a shopping center commonly known as Riviera Plaza Shopping Center with various retail tenants under nonresidential real property leases for commercial space.

8. The Real Property is subject to a foreclosure proceeding in the Superior Court of Allen County, Indiana, Case No. 0201-1008-MF-720 (the "**Foreclosure Case**"). A receiver (the "**Receiver**") was appointed in the Foreclosure Case by order dated October 19, 2010, and the Receiver assumed possession, custody, and control of the Real Property as well as the income derived therefrom as of such date.

9. On May 5, 2012, Wells Fargo Bank, N.A. ("**Wells Fargo**") filed a motion to excuse the Receiver from turning over the Real Property to the Debtor pursuant to section 543 of the Bankruptcy Code (the "**Receiver Motion**"). On May 24, 2012, the Debtor filed a preliminary response to the Receiver Motion and a motion to require the Receiver to comply with section 543, together with a request for an evidentiary hearing (the "**Turnover Motion**," and together with the Receiver Motion, the "**Motions**").

10. After a hearing on the Receiver Motion held on May 15, 2012, and a hearing on the Motions held on May 29, 2012, the Court entered Orders granting the Receiver Motion, authorizing the Receiver to remain in possession of the Real Property, excusing the Receiver from compliance with sections 543(a) and (b), and continuing the Motions for further relief.

11. On June 29, 2012, the Debtor filed its motion to pursuant to section 363 of the

2

Bankruptcy Code for the entry of an Order authorizing the Debtor to enter into leases of certain space at the Real Property (the "**Corner Pocket Lease Motion**") with Leohn Corp. d/b/a Corner Pocket Pub ("**Corner Pocket**").  On July 17, 2012, Wells Fargo filed its response to the Corner Pocket Lease Motion, and its motion to modify the automatic stay pursuant to section 362(d) of the Bankruptcy Code (the "**Lift Stay Motion**").  At a hearing held on July 24, 2012, the Debtor, due to the proposed tenant's late, unforeseen requests for minor changes in the terms of the underlying leases, was compelled to withdraw the Corner Pocket Lease Motion, and the Court granted the Lift Stay Motion, expressly extending to the Debtor the opportunity to file this Motion to vacate the Lift Stay Order, which provides that Wells Fargo may proceed with the Foreclosure Case effective as of August 15, 2012, prior to such date.  The Motions were continued to a hearing scheduled for August 15, 2012, at 10:00 a.m. CT.

**RELIEF REQUESTED AND BASIS FOR RELIEF**

12.     By this Motion, the Debtor requests that the Court enter an Order, pursuant to Rule 9024 of the Bankruptcy Rules, vacating the Lift Stay Order, and providing that the automatic stay remain in effect in this case to permit the Debtor to consummate a plan of reorganization.

13.     Bankruptcy Rule 9024 provides for relief from judgments or orders, incorporating Rule 60(b) of the Federal Rules of Civil Procedure.  Rule 60(b) permits relief from a judgment or order for, among other reasons, (i) application of the judgment or order prospectively is no longer equitable and (ii) any other reason that justifies relief.  F. R. Civ. P. 60(b)(5) and (6); *In re Starling*, 359 B.R. 901, 916 (Bankr. N.D. Ill. 2007).

14.     Rule 60(b) "gives the court a 'grand reservoir of equitable power to do justice in a particular case.'"  *In re Gledhill*, 76 F.3d 1070, 1080 (10th Cir. 1996) (*citing Pierce v. Cook &*

3

*Co.*, 518 F.2d 720, 722 (10th Cir. 1075) (en banc) (*quoting Radack v. Norwegian America Line Agency, Inc.*, 318 F.2d 538, 542 (2d Cir. 1963)). Rule 60(b) should be liberally construed to achieve substantial justice. *United States v. Gould*, 301 F.2d 353, 356-57 (5th Cir. 1962) (*quoting* 7 Moore's Federal Practice P. 60.19, at 237-39).

15. In the Lift Stay Motion, Wells Fargo first argues that the stay should be lifted to allow the Foreclosure Case to proceed due to "[t]he Debtor's apparent inability to provide adequate protection." Lift Stay Motion at ¶ 21. Wells Fargo next asserts that, because the Debtor's lease proposals are "either not feasible based on lack of funding for tenant improvements, or are not commensurate with the current commercial rental market," the Debtor has not shown a reasonable likelihood of reorganizing within a reasonable time. Lift Stay Motion at ¶¶ 22-23. Finally, Wells Fargo summarily asserts that the Debtor "will not be able to file a plan of reorganization that has a reasonable probability of being confirmed within a reasonable time, nor commence monthly payments." Lift Stay Motion at ¶ 24.

16. None of Wells Fargo's arguments and unsupported assertions demonstrates grounds to lift the stay under section 362(d) of the Bankruptcy Code. Application of the Lift Stay Order would therefore be inequitable, and it should be vacated accordingly.

17. The Debtor understands that it has the burden of showing adequate protection under section 362(d)(1). In the Turnover Motion, the Debtor asserted its belief that the interest of the secured lender is adequately protected, and described, based on the Receiver's reports filed in the Foreclosure Case, the wide variance in the net income generated by the Real Property on a monthly basis. Such variance has only continued in the latest Receiver's reports, which show net income of $19,295.66 in April, 2012, negative $25,207.70 in May, 2012, and $14,009.21 in June, 2012. Furthermore, in the Turnover Motion, the Debtor produced documentation showing that

4

the monthly payment due to the secured lender is only $16,186.59, which amount constitutes interest at the non-default rate, in contrast to the $19,166.33 figure cited without any support by Wells Fargo in the Lift Stay Motion. The Debtor requested an evidentiary hearing in the Turnover Motion, which remains pending, in order to resolve such discrepancies as to factual matters. The Debtor submits that Wells Fargo, in citing the Debtor's "apparent inability" to provide adequate protection in the Lift Stay Motion, has not even made a prima facie showing of cause under section 362(d)(1). *See In re 211 Waukegan LLC*, Case No. 11-13104, at *5 (Bankr. N.D. Ill. June 28, 2011) ("A creditor must… prove a decline in the value of property in order to establish a prima facie case of lack of adequate protection."). The Debtor further submits that it has carried its burden to show adequate protection, or, in the alternative, reiterates its request for an evidentiary hearing so that it has due opportunity to make the requisite showing.

18. With respect to section 362(d)(2), in the Lift Stay Motion, Wells Fargo omits any mention of whether the Debtor has equity in the Real Property, let alone makes any attempt to carry its burden under section 362(g) to show that the Debtor has no equity.[1] As for the necessity of the Real Property to an effective reorganization, the Debtor has made substantial progress towards reorganization, and, as detailed below, should have the opportunity to complete the process.

19. Finally, Wells Fargo's unsupported assertions do not demonstrate grounds to lift the stay under section 362(d)(3). Although the Debtor has not yet filed a plan of reorganization, the Debtor believes that the Real Property generates sufficient income to allow the Debtor to commence monthly payments that are in an amount equal to interest at the applicable non-default

---

[1] In this regard, the Debtor notes that the estimated asset values shown in its schedules are not conclusive. *In re Cobb*, 56 B.R. 440, 442 (Bankr. N.D. Ill. 1985). At the evidentiary hearing that the Debtor has requested in its Turnover Motion, the Debtor would be prepared to present competent evidence of the value of the Real Property based on the Debtor's progress leasing the Real Property and current market conditions.

rate on the value of Wells Fargo's interest, if any, in the Real Property. This amount is, at most, $16,186.59, depending on the current valuation of the Real Property. Without the relief requested in the pending Turnover Motion, *i.e.*, the turnover of the Real Property to the Debtor by the Receiver and an evidentiary hearing to determine, among other factual issues, how much income the property generates, how much interest is due to the secured lender, and how much the Real Property is worth on the market, the Debtor will not have had due opportunity to meet the requirements of section 362(d)(3).

20. Since Wells Fargo has not established any grounds for the automatic stay to be lifted in this case, the Lift Stay Order should be vacated as inequitable and the automatic stay should remain in effect to permit the Debtor to consummate a plan of reorganization.

## **OUTLINE OF PROPOSED PLAN**

21. The Debtor intends to confirm a plan by leasing vacant space in the Real Property and pursuing a sale or refinancing transaction that will raise enough value to pay creditors in full. In order to maximize the value of the Real Property and focus its leasing efforts on transactions that will generate highest, most immediate returns, the Debtor has, for marketing purposes, informally divided the Real Property into a "Plaza A," which consists of approximately 40,546 square feet located at all units of the shopping center except the 3201 St. Joe Center Road unit, which is "Plaza B" and consists of approximately 22,588 square feet.

**A.    Plaza A**

22. Concurrently with this Motion, the Debtor has re-filed the Corner Pocket Lease Motion and requested Court authorization to enter into leases with Corner Pocket on definitive terms.

23. The first lease, a certain Lease Extension Agreement and First Amendment of

Lease attached as Exhibit A to the Corner Pocket Lease Motion (the "**Lease Extension**"), extends a current lease with Corner Pocket expiring on June 30, 2012, for approximately 7,152 square feet of space in the shopping center at the 3215 St. Joe Center Road unit. The Lease Extension provides for one five-year term commencing on August 1, 2012, with tenant's option for two (2) five-year renewal terms. The Lease Extension is a triple net lease and the base rent is $3,367.40 in the first year, with 3% annual increases on each anniversary.

24. The second lease, attached as Exhibit B to the Corner Pocket Lease Motion (the "**Lease**"), expands the space leased by Corner Pocket by an additional 2,967 square feet at the 3221 and 3223 St. Joe Center Road units. The Lease also provides for one five-year term commencing on August 1, 2012, with tenant's option for two (2) five-year renewal terms. The Lease is also a triple net lease and the base rent is $1,396.96 in the first year, with 3% annual increases on each anniversary.

25. As discussed in the Corner Pocket Lease Motion, Corner Pocket's expansion will increase the total space it leases in the shopping center to 10,119 square feet.

26. The Debtor has also obtained a fully executed letter of intent from Dollar General Corporation ("**Dollar General**"), attached hereto as Exhibit A (the "**Dollar General LOI**"), to lease 10,133 square feet for a ten-year term on a triple-net basis at an annual rent of $64,879.16 in each of the first five years, subject to 10% increases in each five-year period thereafter.

27. Based on the foregoing, the Debtor has commitments to lease over 90% of the available space in Plaza A. The Debtor anticipates that documentation of definitive lease terms with Dollar General would take place in 90-120 days.

28. As shown on Exhibit B attached hereto, on the basis of an occupancy rate in excess of 90%, Plaza A would generate approximately $290,760 in net operating income.

7

According to David Nugent at BND Commercial ("**BND**"), the leasing agent for the Real Property, prevailing capitalization rates in the area range from 8.75% to 9.75%. At these rates, after reasonable adjustments to net operating income to account for any vacancy rate and reserves for capital improvements, prospective purchasers would value and pay between $2.9 and $3.3 million for Plaza A. The Debtor has received other informal estimates provided by an independent broker, First Western Properties, Inc. ("**First Western**"), which are consistent with this price range, valuing Plaza A at between $2.9 and $3.1 million.

### B.      Plaza B

29.     The Debtor is in active, ongoing negotiations with a discount grocer to lease the 22,588 square feet in Plaza B for approximately $6.00 per square foot on a triple-net basis. The Debtor anticipates that documentation of definitive lease terms with the tenant would take place in 90-180 days.

30.     As shown on Exhibit C attached hereto, upon consummation of this lease, Plaza B would generate approximately $133,433 in net operating income. According to BND, at the prevailing capitalization rates noted above, after reasonable adjustments to net operating income, prospective purchasers would value and pay between $1.2 and $1.4 million for Plaza B. First Western's estimates value Plaza B at as much as $1.5 million.

### C.      Plaza A and B

31.     As shown on Exhibit D attached hereto, upon consummation of the leasing transactions described above, Plaza A and Plaza B – the Real Property as a whole – would generate approximately $424,193 in net operating income, and command a market value of between $4.1 and $4.7 million, which is more than sufficient to allow the Debtor to confirm a plan that pays creditors in full.

32.     The Debtor believes that its plan demonstrates that the Debtor has a reasonable likelihood of reorganizing within a reasonable time under the applicable standards of section 362(d) of the Bankruptcy Code.

33.     The Debtor has either already documented definitive lease terms or is actively negotiating such terms with tenants pursuant to imminent transactions that will result in nearly full occupancy of the shopping center in the foreseeable future.

34.     In contrast, Wells Fargo has provided no support for its bare assertions that these transactions are "either not feasible based on lack of funding for tenant improvements, or are not commensurate with the current commercial rental market." Lift Stay Motion at ¶¶ 22-23.

35.     As noted above, Wells Fargo has made no attempt to carry its burden under section 362(g) to show that the Debtor has no equity in the Real Property.  Even if a presumption that the Debtor has no equity were adopted, the Debtor has carried its burden at this stage in the case to establish that the Real Property is necessary to an effective reorganization.  *In re Cadwell's Corners Partnership*, 174 BR 744, 759 (Bankr. N.D. Ill. 1994).  Under the sliding scale approach applied to lift stay proceedings in *Cadwell's Corners*, "in the initial stages of a Chapter 11 proceeding, the debtor should be granted significant leeway in attempting to establish that successful reorganization is a reasonable possibility…. Even at the later stages, a motion for relief from stay should not be turned into a confirmation hearing; that is not the debtor's burden of proof."  *Id.* (*citing In re Ashgrove Apartments of DeKalb County, Ltd.*, 121 B.R. 752, 756 (Bankr. S.D. Ohio 1990)).  In accordance with the standards set forth in *Cadwell's Corners* and *Ashgrove*, the Debtor has, at a minimum, established that (i) the Debtor is moving meaningfully to propose a plan of reorganization, (ii) the Debtor's contemplated plan has a realistic chance of being confirmed, and (iii) its contemplated plan is not patently unconfirmable.  *Id.*

36. The Court should vacate the Lift Stay Order to permit the Debtor to complete the process of filling the vacant leasable space in the shopping center, increase the value of the Real Property for the benefit of its estate and creditors, and proceed to confirm a plan.

## NOTICE

37. Notice of this Motion has been provided to: (i) the office of the United States Trustee; (ii) counsel to Wells Fargo; (iii) the Receiver for the Real Property appointed in the Foreclosure Case; (iv) the Debtor's unsecured creditors; and (v) any parties that may have requested notice in this case pursuant to Rule 2002 of the Bankruptcy Rules. The Debtor submits that under the circumstances no other or further notice is required.

WHEREFORE, the Debtor respectfully requests that the Court enter an order (i) granting the relief requested in the Motion; (ii) vacating the Lift Stay Order and providing that the automatic stay remain in effect in this case to permit the Debtor to consummate a plan of reorganization; and (iii) granting such other and further relief as may be just and proper.

Dated: August 10, 2012

Respectfully submitted,

RIVIERA PLAZA INVESTMENTS, LLC

By: /s/ Ethan Ostrow

Ethan Ostrow (ARDC No. 6290394)
BROWN, UDELL, POMERANTZ &
DELRAHIM, LTD.
1332 North Halsted Street, Suite 100
Chicago, IL 60642
Telephone: (312) 475-9900
Facsimile: (312) 475-1188
Email: eostrow@bupdlaw.com

*Counsel for the Debtor and Debtor in Possession*